**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**PECOS DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| **v.** | § | **CAUSE NO: 4:26-CR-140** |
| | § | |
| **BRAULIO MURILLO-TAVAREZ** | § | |

**DEFENDANT'S MOTION TO SUPPRESS STATEMENTS**

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, BRAULIO MURILLO-TAVAREZ, Defendant in the above numbered and captioned cause, and presents this Motion to Suppress Statements, and in support thereof, would respectfully show this Court as follows:

*1. Posture of Case*

Defendant stands charged in a two count indictment, returned on July 16, 2026. Count 1 charges Defendant with being a Prohibited Person in Possession of a Firearm under 18 U.S.C 922(g)(5)(A). Count 2 charges Defendant with Illegal Re-entry under 8 U.S.C. 1326(a) & (b)(1).

The current Plea Deadline is September 30, 2026, with a Trial Date of October 19, 2026.

*2. Facts*

Defendant was arrested by a United States Border Patrol (USBP) agent on June 27, 2026 on allegations that he was illegally present in the United States. It is undisputed that, at the time of his apprehension, Defendant was NOT in possession of a firearm or ammunition. The arresting agent was equipped with a body camera, and footage of the apprehension shows Defendant being taken into custody without incident, being placed in the rear of the USBP vehicle, and being transported to the USBP station. At no time during this video is Defendant given the warnings required under

*Miranda.*

Earlier that same day, according to the Criminal Complaint [DOC 1] in this case, USBP had encountered two other individuals, Edgar Berrios-Najera and Misael Hernandez-Rodriguez. These two individuals, at the time of their apprehension, were in possession of AK style rifles and 53 rounds of 7.62 ammunition. (Initially, Defendant and these two individuals were charged on a common complaint, but they were later indicted separately). An investigation by USBP agents had, according to the Complaint [DOC 1], "led them to determine that [Defendant's] border crossing was related to the border crossing of [the other two individuals]".

During the transport from the site of Defendant's arrest, approximately 19 minutes and 30 seconds into the bodycam video, the arresting agent received a radio call. The calling unit stated that they needed to determine whether Defendant was connected to the other two individuals. The arresting agent responds in the affirmative. Approximately 30 seconds later, the arresting agent asked Defendant, in Spanish, "When did you cross the border? Now?" Defendant responded, although that response cannot be heard on the recording. The agent continued, "Did you bring arms with you? Arms? Rifles?" Again, Defendant's response is unintelligible on the tape, however the next question indicates an affirmative response from Defendant. The agent follows up with, "One? Where is it?" Defendant gives a lengthy response, which is, again, impossible to understand. The agent concludes the interview with, "I can't hear you, we'll talk when we get there."

Later, at the station, Defendant was interviewed again. This time, the video clearly shows the required *Miranda* warnings being given. Approximately 13 minutes into the video, the following exchange occurs:

Agent: "How often did you use guns?"

Defendant: “No, I never used guns.” Proceeds to discuss that he was wearing a heavy vest and that his feet were hurting.

Defendant: “And so I threw it away, I threw it away before arriving at the river. There in the river.” [Note: translator believes this statement refers to the vest.]

Defendant: “There I threw away the pistol that I had.”

Agent: “Before crossing?”

Defendant: “Yes, no, on this side of the river I threw it away. I crossed the river and when I crossed the river I threw it away.”

Defendant: “You understand? Because I was really tired from my feet and I climbed up a small hill. And there I saw it’s like an American military hummer and that’s where I asked for help. You understand I said hey sir hey sir. Someone was there.

Approximately seven minutes later, after discussing other topics, the conversation returns to the gun:

Agent: “Why did you leave it behind? Why did you leave the gun behind?”

Defendant: “Because I was going through the brush and it got in my way. I couldn’t get through faster and I heard shots.”

Agent: “So you left it behind because you had to?”

Defendant: “Because I had to run. Because I heard shots, there were shots and there were thorns.”

Agent: “So they got you without a gun?”

Defendant: “Without a gun.”

Agent: "So you never used a gun? Never, never, never? You never used it? Sure? Sure?"

Defendant: "No, I never used my gun."

Agent: "You never used it?"

Defendant: "I never used it."

Agent: "You never used any?"

Defendant: "Never, no, no, never, ever."

A few minutes after this exchange, and a discussion of Defendant's tattoos, the interrogation again returned to the subject of the gun:

Agent: "You didn't have a pistol?"

Defendant: "No, only the long gun."

Agent: "What kind of gun was it?"

Defendant: "It's like the state police use. It's an AR-15 too, but it's a small one. The municipal police use it in Mexico, but it's an AR-15 too, I think."

There was no further discussion of the gun during this interrogation. According to the Memorandum of Investigation disclosed in discovery, the next day, June 28, 2026, USBP agents, "acting on intelligence from the previous shift" searched the area of the Rio Grande River where the three individuals were believed to have crossed. The following items were found: a black short barreled .223 rifle (with magazine in place), a 2 magazine pouch of .223 rifle (for a total of three magazines), 51 rounds of .223 ammunition, a half skull face mask, a black baseball hat, and a small bag of q-tips.

On July 16, 2026, the Indictment [DOC 16] in this case was returned by the Grand Jury.

*3. Grounds for Suppression*

**a. Any statements given by Defendant during the ride to the station were given without the required *Miranda* warnings and must be suppressed.**

It is well-settled law that any statements given by a defendant in a custodial interrogation must be suppressed, unless the defendant has been given the required *Miranda* warnings and has agreed to the interview. *See Miranda v. Arizona,* 384 U.S. 436 (1966). While certain exceptions may exist to this rule, none were applicable here.

Defendant was clearly in custody at the time of this questioning. The body cam video clearly shows Defendant being placed in the back seat of the USBP vehicle and being locked inside. He was in the process of being transported to the USBP Station for processing. Any reasonable person would understand that he was not free to leave at this point.

During the ride, the arresting agent was informed, via radio, that agents needed to determine whether Defendant was connected to the other two individuals apprehended earlier in the day. The arresting agent indicated this could be done, and then, 30 seconds later, proceeds to question the Defendant. No *Miranda* warnings were given.

Although Defendant's statements may not be intelligible on the recording, the context of the questioning makes it clear at least the general nature of Defendant's responses. As shown above, it is clear from context that Defendant told the agent when he crossed, that he had a gun when he crossed, and that he at least attempted to tell the officer where the gun could be found.

Clearly, these statements, given without benefit of the required *Miranda* warnings, should be suppressed.

**b. The statements given by Defendant in the subsequent interview regarding the gun should also be suppressed, as they were the result of an unlawful two-step**

**interview process.**

The Government will doubtless argue that the omission of *Miranda* in the first interview was inadvertent, and that the statements given in the second interview, in which the warnings were given, are perfectly admissible. Indeed, the United States Supreme Court had held that the "fruit of the poisonous tree" doctrine does not apply to subsequent statements given after inadvertent *Miranda* violations. *See Oregon v. Elstad,* 470 U.S. 298 (1985). ". . .[A] suspect who has once responded to unwarned *yet uncoercive* questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite *Miranda* warnings." *Id.* at 318.

In *Elstad*, the suspect was a young man believed to be involved in a burglary. *Id.* at 300. The officer arrived at the suspect's home and went into the kitchen to advise the suspect's mother of a warrant for her son's arrest. *Id.* The officer then sat down with the young suspect and if the suspect was aware why the police were there. *Id.* at 301. The suspect replied that he had no idea. *Id.* The officer then asked if he knew another young man who was also a suspect, receiving an affirmative response. *Id.* The officer asked the suspect about the burglary, and informed him that the officer believed he was involved. *Id.* The suspect then admitted, "yes, I was there." *Id.*

This was the extent of the pre-*Miranda* questioning. The suspect was transported to the station, where, about an hour later, he was given the full *Miranda* warnings and gave a full confession. *Id.*

The instant case is readily distinguishable from *Elstad.* In *Elstad*, the *Miranda* error was inadvertent and brief. In fact, according to the opinion, the incriminating statement, "yes, I was there" did not even come in response to a direct question. It was volunteered after the officer told the suspect the police believed he was involved.

In this case, however, the *Miranda* error was far from inadvertent. The arresting USBP agent received a radio call, stating that the USBP needed to tie Defendant to the other two subjects. He responded that this could be done. The agent then proceeded to ask Defendant incriminating questions, knowing full-well that he had not administered the warnings. This was at best a knowing violation, at worst an intentional one.

Once the agent had determined when Defendant had crossed the border, and that he had had a weapon, he suddenly decided he could not hear Defendant's description of the location of the weapon, and told Defendant they would discuss it later. Some time later, at the station, an interview was conducted, with proper *Miranda* warnings, in which Defendant was questioned regarding the gun. It is telling that the agents conducting the interview did not even ask Defendant if he had a weapon - they already knew that from his prior statements. Instead, they focused on follow-up questions regarding the rifle.

These questions concentrated on what type of weapon it was, where the weapon was abandoned, and whether Defendant had ever used the weapon. There was no attempt, whatsoever, to cure the *Miranda* violation during the ride to the station by asking for basic information. Instead the agents simply chose to build on information they already had - albeit unlawfully.

The Supreme Court has previously disallowed just such a scheme. *See Missouri v. Seibert,* 542 U.S. 600 (2004) (plurality opinion). In *Siebert,* a law enforcement officer began a custodial interrogation of the suspect without *Miranda* warnings. *Id.* at 604. It should be noted that the omission of the warnings was deliberate. *Id.* After questioning the suspect for 30 or 40 minutes, the suspect finally admitted guilt. *Id.* at 604-605. At that point, the suspect was given a 20 minute break. *Id.* At that point, the officer re-entered the room, turned on a recorder, gave the *Miranda*

warnings, and proceeded with the interrogation, building on the previous unwarned statements. *Id.* The suspect gave additional incriminating statements, leading to her conviction of first-degree murder. *Id.*

Writing for the *Siebert* plurality, Justice Souter stated, "The threshold issue when interrogators question first and warn later is thus whether it would be reasonable to find the warnings could function "effectively" as *Miranda* requires." *Id.* at 611. To be effective, the warnings must effectively advise the suspect that he has a real choice about giving further statements or ending the interview. *Id.* "For unless the warnings could place a suspect who has just been interrogated in a position to make such and informed choice, there is no practical justification for accepting the formal warnings as compliance with *Miranda*, or for treating the second stage of interrogation as distinct from the first, unwarned, and inadmissible statement." *Id.*

Justice Kennedy, concurring in the judgment in *Siebert*, stated, "The admissibility of postwarning statements should continue to be governed by the principles of *Elstad*, unless the deliberate two-step strategy was employed. *Id.* at 622. "If the deliberate two-step strategy has been used, postwarning statements *that are related to the substance of prewarning statements* must be excluded, unless curative measures are taken before the postwarning statement is made. *Id.* (emphasis added).

In the instant case, a deliberate two-step interrogation technique was used. Defendant had already confessed to the crime of which he was accused before ever receiving the *Miranda* warnings, and the agents involved knew that. No attempt was made to cure the violation. The subsequent interrogation simply sought to build on the first.

All of Defendant's statements regarding the weapon should be suppressed.

*4. Motion to Suppress*

For the reasons stated herein, Defendant respectfully moves this Court to SUPPRESS any and all statements made by Defendant in this case regarding the possession, transportation, or location of a firearm by Defendant, or in any way referencing a firearm, and to declare such statements to be INADMISSIBLE against Defendant in this case.

*5. Prayer*

WHEREFORE, PREMISES CONSIDERED, Defendant respectfully prays this Court to set this Motion for hearing, and upon hearing of this Motion GRANT this Motion in all respects, to

grant unto Defendant the relief requested herein and to grant unto Defendant such other and further relief to which he may show himself justly entitled.

Respectfully submitted,

/s/ Bart E. Medley

BART E. MEDLEY
State Bar No. 24035671
Attorney for Defendant

P.O. Box 1937
Fort Davis, Texas 79734
(915)526-6255 voice
bart@bartmedley.com

**CERTIFICATE OF CONFERENCE**

I, Bart E. Medley, hereby certify that I have conferred with AUSA Jim Hollaway, counsel for the Government in this cause, regarding the subject of this Motion and that the Government is OPPOSED to this Motion.

/s/ Bart E. Medley

**CERTIFICATE OF SERVICE**

I, Bart E. Medley, hereby certify that a true and correct copy of the foregoing pleading was served upon the attorney representing the Government by electronic means at the time of its entry into the CM/ECF System.

/s/ Bart E. Medley